### Watson v. Watson, et al.

(Decided January 21, 1921.)

## Appeal from Pulaski Circuit Court.

1.  Deeds—Mental Capacity—Burden of Proof.—The law looks with suspicion upon the transfers of property by persons mentally or physically infirm, to those having custody of them, and even when parties in good health sustain a confidential relation to each other, the burden is upon the stronger character, who procured an advantage, to show by clear and convincing evidence that the transaction was freely and voluntarily entered into and devoid of inequitable incidents.

2.  Deeds—Undue Influence—Burden of Proof.—Where a son, after the death of his father, bought the interests of the other heirs as well as purchased his mother's dower right in the farm and she continued to live with him, being 74 years of age, crippled and afflicted with disease, and being very much disturbed and grieved about the death of her husband, a contract entered into by her with her son while she was on the bed of affliction to support her during the remainder of her life in consideration of $800.00 cash then paid and all of the property of which she may die the owner, will be set aside at the instance of the proper parties on the ground that the circumstances show undue influence exercised by the son, and an undue advantage obtained by him, which he failed to disprove by clear and convincing evidence under the burden which the law casts upon him under such circumstances.

E. T. WESLEY and J. W. COLYAR for appellant.

W. M. CATRON for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellees and plaintiffs below, J. A. Watson, et al., are three of the surviving children of Savannah Wat-

son, who died intestate on November 19, 1917, a resident of Pulaski county at the age of 74 years; and appellant and defendant below, Joe Watson,, is the fourth and only other surviving child of the decedent. Plaintiffs, after the death of their mother, filed this suit against defendant to cancel a contract which he obtained from her on September 25, 1917, wherein she agreed to pay him the sum of $800.00 cash at the time, and to convey to him all of her property which she owned at her death, in consideration that he would furnish her "A comfortable home and food with himself and family and all necessary service that she may require for her well being and comfort . . . during the remainder of her natural life, or as long as the party of the first part (the mother) desires to make her home with the party of the second part," who was the defendant. The ground for the relief sought was that the consideration agreed to be paid by the mother was grossly excessive for the services agreed to be rendered by the son; that the mother was unduly influenced by the defendant to execute the contract, and that she was mentally incapacitated at the time to do so, and that defendant took advantage of her age and of her physical and mental condition and coerced her into executing it. The petition prayed that the contract be set aside and held for naught and that defendant be required to account for the $800.00 paid at the time it was executed, and also the value of the property owned by the decedent at the time of her death, for distribution among the heirs as in case of intestacy. The answer denied the averments of the petition and the court after hearing the evidence upon final submission set aside the contract and granted the relief prayed in the petition, but allowed defendant the sum of $100.00 for services rendered for the time (less than two months) between the execution of the contract and the death of the mother. Complaining of that judgment defendant appeals and his counsel argues for a reversal only the one question of fact presented by the pleading.

In July preceding the execution of the contract, and prior to the death of Mrs. Watson, her husband died owning a farm in Pulaski county upon which he and his wife had lived for many years and had reared to manhood and womanhood their four children; the husband having other children by a former marriage. De-

fendant appears to have been the young'est of the four children and was married and lived in a separate house upon the farm, which was located but a short distance from the Watson homestead. The mother of plaintiffs and defendant was very much attached to her husband and his death grieved and disturbed her very much. She was also, like most old people, extremely attached to the old home place where she had spent many happy days in association with her husband and with her children, and she wanted to spend the rest of her days therein. Defendant knew these facts, and he also knew that his mother was entitled to dower in the lands of her deceased husband, but notwithstanding that, he seems to have joined with his older half brother, and perhaps others of the heirs, in persuading his mother to sell the homestead, including her dower therein, and he purchased from her and the other heirs all their interest and became the sole owner thereof. It furthermore appears that prior to or about the time of the sale the mother expressed an abiding desire to continue to reside at the old place with defendant, although her other children lived not far away, in the same neighborhood and whom she visited at times, but she made only one such visit after the death of her husband, and upon returning therefrom to the home of defendant she was stricken with some physical ailment (she being already crippled so that she had to use crutches), and this with her advanced age confined her from that time until her death in her son's home, and the most of that time she was confined in bed and was so confined on the day the contract in question was executed when she had to be lifted or propped up in order to sign it. Mrs. Watson from the time of her husband's death drew a pension of $35.00 per month and her savings from this source, with the amount she received for her dower in the homstead, went to make up the $800.00 cash which she paid at the time the contract was executed, and at her death she had cash and personal property amounting to between $500.00 and $700.00, making a total consideration paid to defendant of between $1,300.00 and $1,500.00. It furthermore appears that another contract for the same services was executed by Mrs. Watson about two weeks before the one in contest, both of them being drafted by Dr. Price at the solicitation and request of defendant, which he

made at the home of the doctor and in the absence of Mrs. Watson. In the first contract defendant agreed to render the services for $800.00 cash to be paid at the time, but Dr. Price, with whom that contract was left, having misplaced or lost it, a second one (being the one in contest) was drafted and Mrs. Watson agreed therein to pay defendant, in addition to the $800.00 stipulated in the first contract, all of the property which she might own at her death.

Quite an array of witnesses were introduced by both sides to the controversy and there is considerable contrariety, as is usual in such cases, in their testimony. In fact, the testimony of all the witnesses is extremely unsatisfactory, growing largely out of the fact that attorneys for both sides grossly violated the rule against asking leading questions, and indulged in much inquiry about trifling and immaterial matters, overlooking the investigation of material and more vital ones. Sufficient facts appear, however, to convincingly show that Mrs. Watson, especially after her husband's death, was very feeble physically (but it did not appear that she was troublesome to care for) and that she was very forgetful of names of persons and would wander in her conversation, frequently changing the subject in the midst of an unfinished conversation, and in the main the witnesses introduced by plaintiffs testified that from their acquaintance and knowledge of her she was not at and about the time of the execution of the contract mentally capacitated to understandingly execute it. On the other hand some of the witnesses introduced by defendant say that "her mind appeared to be as good as it had been for several years," while others say in substance that if there was anything the matter with her mind they did not discover it. Clearly such evidence is of the weakest character and possesses but little convincing force. If, however, we should put aside entirely the express testimony of the witnesses as to their opinions concerning the mental capacity of Mrs. Watson we are convinced that the undisputed facts and circumstances appearing in the record are amply sufficient to support the judgment appealed from.

It will be observed that the instrument attacked here is not a last will and testament, which requires less mental capacity, and in the execution of which the law tolerates the exercise of more influence on the maker

than is required or permitted in the execution of a contract *inter partes;* and the law is, as has been frequently held by this court, that contracts between those occupying a confidential relation to each other will be closely scrutinized, and the burden is upon him who claims under it to show "by the clearest evidence that the transaction was freely and voluntarily entered into, and devoid of inequitable incidents." Smith v. Snowden, 96 Ky. 32. See also McDowell v. Edwards, 156 Ky. 475; Miller v. Taylor, 165 Ky. 463; Kelley v. Fields, 167 Ky. 796, and the numerous cases referred to therein. In the Snowden case a conveyance by parents, who were about 70 years of age, to two children who lived with them was set aside and in the course of the opinion the court said:

"In the case under consideration the grantors were old, ignorant and enfeebled by disease; the grantees were vigorous, aggressive and already in charge of the persons and the property of the grantors. We may say in general that when such a relation exists the person obtaining the benefit must show, by the clearest evidence, that the transaction was freely and voluntarily entered into and devoid of inequitable incidents."

In the case of Bazarth v. Banister, 143 Ky. 476, referred to in the cases, *supra,* the grantor was the father and the grantee was his son, the two living together, and the grantor was enfeebled with age, and the court held that a confidential relation existed and that "Only slight evidence of undue influence was necessary to authorize the setting aside of a deed on that ground." In the Taylor case the court found that the proof of undue influence was slight, but the opinion says that "Under the law which looks with suspicion on death bed transfers it is sufficient to support the finding of the chancellor. He knew the witnesses, and the burden was upon the appellant to show the fairness of the transaction," and under the rule which requires this court not to disturb the finding of the chancellor where the evidence is conflicting, or where there is only a doubt as to the truth of the matter, the judgment cancelling the deed involved was affirmed. Many of the case referred to from this court will be found to contain facts very analogous to the ones here involved. Indeed, one can hardly read this record without concluding that it was the purpose of the defendant from the beginning to take advantage

of his situation and relation to his mother and of her distressed and enfeebled condition, and to finally possess himself of all her earthly belongings. This purpose was begun by purchasing her dower interest in the homestead, thus depriving her of the legal right to occupy the residence and of carrying out her cherished and frequently expressed desire to continue living there till her death. Defendant was thus in position to dictate to her the terms upon which her wish might be gratified. The dower interest no doubt was sufficient to have supported her during the remainder of her life, which from all external indications, and according to natural laws, must necessarily be short. But if not so, her pension of $35.00 per month would more than make up any deficit in that regard. He knew of her determined desire to live out the few remaining days of her life on the old homestead, which possessed to her both a sentimental as well as an affectionate value. Having arranged matters so that she no longer had the legal right to occupy the homestead he then began to procure the contract, and first had it drafted in the absence of his mother so as to pay him only $800.00, which under the circumstances was itself very exorbitant. About two weeks from that time, and while his mother was yet in bed sick, which the appearances indicated would be her last affliction, and perhaps realizing that she would die possessed with still other property, he in the same manner procured a second contract (the one in controversy) altering the consideration so as to include all of his mother's property which she might own at her death. Surely, under the circumstances, the rule, *supra*, concerning transactions between those sustaining confidential relations, would apply in all of its vigor in this case. The burden which that rule casts on the defendant has not been met by him. The $100.00 which the court allowed him was ample remuneration for the services he rendered and he has no legal ground to complain of the court's judgment, which is in complete accord with the cases, *supra* from this court, as well as following the general principles of equity laid down by the text writers, and it is affirmed.